## In the United States District Court for the
## Middle District of Alabama
## at Montgomery

| | | | |
|---|---|---|---|
| Anne Marie Hunter | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | |
| vs. | | ) | 2:06-CV-00411-WHA-SRW |
| | | ) | |
| Dürr Systems, Inc. | | ) | |
| | | ) | |
| | Defendant. | ) | |

### Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment

COMES NOW Plaintiff and for her Memorandum in Opposition to Defendant's Motion for Summary Judgment states:

### Plaintiff's Response to Defendant's Statement of Undisputed Facts

Plaintiff responds to Defendant's Statement of Undisputed Facts as follows:

1.    Plaintiff filed this suit invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 as a result of a fall that resulted in injuries Plaintiff sustained on or about January 26, 2005. (Plaintiff's Complaint, ¶¶ 5 and 6).

**Plaintiff's Response:**          Admitted

2.    Plaintiff is a freelance photographer who was working as an independent contractor photographing a robotic paint booth at the Hyundai Motor Manufacturing Alabama plan[t] in Montgomery, Alabama at the time of her fall. (Plaintiff's Complaint, ¶ 6); (Exhibit "A", pg. 47 Lines 17 through 23, pp. 65 Line 9 through 66 Line 1, pp. 80 Line 1 through 81 Line 20, and pg. 83 Lines 18 through 20, attached).

**Plaintiff's Response:**          Admitted

3.      The robotic paint booth contained an elevated catwalk with a metal grated floor. On the date of Plaintiff's accident, one of the grates was missing. The missing grate was five feet (5') long and over two feet (2') wide. (Exhibit "B", ¶¶ 4 and 5, *attached*).

**Plaintiff's Response:**   Admitted, with these corrections.  First, it is incorrect to call the area where this accident occurred a "catwalk."  As Plaintiff stated in her deposition at page 85, line 19 to page 86, line 4:

Q.      Okay.  All I'm trying to establish is it's not a level floor, you're walking up on kind of a catwalk?

A.      I think catwalks are defined much higher.  I wouldn't say that.  I've been on catwalks.  That's just a floor for the bodies to pass on.  Yeah, I mean, if you call a foot drop-off a catwalk, but I wouldn't call it that.

Further, Plaintiff does not believe that the missing grate was five feet (5') long.  It was three and one-half (3 ½ to 4) feet in length.  **See** Affidavit of Anne Marie Hunter, ¶4, attached hereto as Exhibit H.

4.      Plaintiff entered the paint booth with the missing grate and took photographs in both directions prior to her fall. (Exhibit "A", pp. 65 Line 9 through 66 Line 1, *attached*).

**Plaintiff's Response:**   Admitted, but with these additional facts: While Plaintiff was taking photographs in both directions, the fact that the grate was missing was not known to Plaintiff (and could not have been known to Plaintiff) because a skid, carrying a car body, was sitting atop the area where the grate was missing, thereby concealing it from view.  **See** Affidavit of Anne Marie Hunter, ¶4, attached hereto as "Exhibit H".  Further, because the car body was much longer than was the hole created by the missing grate, even after the car bodies started moving, the hole remained concealed.   **See** Affidavit of Anne Marie Hunter, ¶6.f., attached hereto as "Exhibit H".

5.      When Plaintiff first entered the paint booth, the cars were not moving.  (Exhibit "A", pg. 58 Lines 16 through 17, *attached*).

**Plaintiff's Response:**    Admitted, but with these additional facts: When Plaintiff first entered the paint booth, the fact that the grate was missing was not known to Plaintiff (and could not have been known to Plaintiff) because a skid, carrying a car body, was sitting atop the area where the grate was missing, thereby concealing it from view.  **See** Affidavit of Anne Marie Hunter, ¶4, attached hereto as "Exhibit H". Further, because the car body was much longer than was the hole created by the missing grate, even after the car bodies started moving, the hole remained concealed.   **See** Affidavit of Anne Marie Hunter, ¶6.f., attached hereto as "Exhibit H".

6.      After Plaintiff made certain technical determinations, the cars started moving. (Exhibit "A", pp. 58 Line 18 through 59 Line 21, *attached*).

**Plaintiff's Response:**    Admitted

7.      Plaintiff then followed a car moving away from her through the paint booth walking along the catwalk where the hole was located. She was facing in the direction of the hole, and photographing a car that was approximately ten feet (10') in front of her. (Exhibit "A", pp. 80 Line 1 through 81 Line 20 and pg. 87 Lines 6 through 22, *attached*).

**Plaintiff's Response:**   Denied.

First, once the cars started moving, one car body was moving away from Plaintiff and one car body was moving towards her [Hunter Deposition (Exhibit D), page 72, line 13 to page 73, line 23], requiring Plaintiff to take evasive action to avoid the car body coming towards her [Hunter Deposition (Exhibit D), page 73, lines 2-15].

3

Second, as Plaintiff was following the skid and car body into the paint booth:

(a)     the skid and car body in front of her was moving at a speed of five (5) meters per minute [Rathsack Deposition (Exhibit C), page 16, lines 20-22, and page 24, lines 3-21]

(b)     Plaintiff was following the skid and car body in front of her towards the robotic paint booth, all the while taking photographs of the car body that was moving in front of her [Deposition of Anne Marie Hunter, page 89, lines 8-15, page 92, lines 7-12].

(c)     Plaintiff's attention was focused on the moving robotic arms, not only because that was what she had been hired to photograph, but because:

   (1)     Bruno Welsch had warned Plaintiff that the robots were dangerous, because they are moving, they are fast, and they are strong [Welsch Deposition (Exhibit B), page 8, lines 15-23];

   (2)     Plaintiff has been hit by a robot before [Hunter Deposition (Exhibit D), page 72, lines 11-12]; and

   (3)     Plaintiff knew that robots could always do something erratic and that "you really have to watch for them" [Hunter Deposition (Exhibit D), page 93, line 9 to page 94, line 6]

(d)     during a substantial portion of this process (which process lasted only a very short time, since the time that passed between Mr. Rathsack starting up the robotic paint arms and the time when Plaintiff fell was only a matter of seconds) [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H], the car body concealed the fact that a grate was missing [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H].

Third, the car body was not ten (10) feet away from Plaintiff.  At page 87 of Plaintiff's deposition, lines 18-22, Plaintiff testified as follows:

Q.     Now, at that point in time, how far is the car that you're photographing in front of you, how far away is it?

A.     Ten feet **maybe** [emphasis added]

And, as explained by Plaintiff at page 59, lines 17-21 of her deposition, when the car body "moves forward, then I start to move forward, and I follow its line, **get as close as I can** without putting myself in danger of getting sprayed with paint so . . ." [emphasis added]  Very little time elapsed between Mr. Rathsack starting the robotic arms and Plaintiff's fall - only a matter of seconds [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H].  During almost the entirety of that time, the car body concealed the fact that there was a grate missing [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H].  Even after the car bodies started moving forward, the car body in front of Plaintiff continued to conceal the fact that there was a grate missing, because the length of the car body was much longer than the length of the missing grate [Affidavit of Anne Marie Hunter, ¶6.f, attached hereto as Exhibit H].   While taking photographs in the robotic paint booth, Plaintiff followed the car body in front of her and tried to stay as close to it as possible - close enough to reach out and touch it with her hand  [Affidavit of Anne Marie Hunter, ¶6.g, attached hereto as Exhibit H].  However, the distance Plaintiff was from the moving car body would vary by a few feet since it was constantly moving and Plaintiff would stop for a second or two (just long enough to set down her tripod and snap a few photographs) before moving forward again, following the car body in front of her [Affidavit of Anne Marie Hunter, ¶6.g, attached hereto as Exhibit H].

Fourth, it is incorrect to call the area where this accident occurred a "catwalk." **See** Plaintiff's

deposition page 85, line 19 to page 86, line 4.

8.      Periodically, Plaintiff would pickup her tripod, move forward on the catwalk, set down the

tripod, and take more photographs. (Exhibit "A", pg. 80 Lines 1 through 18, *attached*).

**Plaintiff's Response:**  Denied for this reason.  It is incorrect to call the area where this accident

occurred a "catwalk" [Deposition of Anne Marie Hunter page 85, line 19 to page 86, line 4,

attached hereto as Exhibit D].

9.      Nothing was obstructing Plaintiff's view of the hole as she followed and photographed the

car in front of her. (Exhibit "A", pp. 88 Line 3 through 91 Line 3, *attached*).

**Plaintiff's Response:**    Denied.  When Plaintiff entered the robotic paint booth to take the

photographs, she was carrying with her (1) a camera with a telephoto lens on it, (2) a camera bag

containing other lenses, another body, batteries, filters, and other equipment that Plaintiff uses, (3)

a flash, (4) an extra battery pack, (5) a film bag, and (6) a tripod [Hunter Deposition (Exhibit D),

page 53, lines 2 to page 54, line 9], all of which weighed approximately 35 pounds [Hunter

Deposition (Exhibit D), page 54, lines 10-14], with the tripod weighing approximately seven

pounds [Hunter Deposition (Exhibit D), page 54, lines 15-22]. As Plaintiff testified in her

deposition at page 88, lines 11-21:

Q.      But what I'm asking, there wasn't anything between you and that car that would
        have kept you from seeing that hole, is there?

A.      At that point of – yes, my gear probably.

Q.      What gear?

6

A.      My camera bag, my tripod, my camera, my film bag were all around me, and so I would have expected the floor to be there.

When this accident happened, Plaintiff was concentrating on the robotic arms painting the car body and the shot she wanted to get [Deposition of Anne Marie Hunter, page 89, lines 8-15] and, even if she had look down, she could not have seen the gap in the flooring because the camera and bag might have obstructed her view [Deposition of Anne Marie Hunter, page 89, line 21 to page 90, line 1].

Further, Bruno Welsch had warned Plaintiff that the robots were dangerous, because they are moving, they are fast, and they are strong [Welsch Deposition (Exhibit B), page 8, lines 15-23]. Plaintiff has been hit by a car before and been hit by a robot before [Hunter Deposition (Exhibit D), page 72, lines 11-12]. As Plaintiff testified at page 93, line 9 to page 94, line 6:

Q.      At the time you actually stepped your foot in that hole in the floor, are you looking at the robots?

A.      Yes.

Q.      Was there anything in particular that you were looking for when you did that?

A.      I look for a lot of things when I'm shooting. I look for light, I look for color, shape. I also watch to make sure the robots are not doing something erratic, because they can in a startup of a plant. They always can. I mean, that could be even during when the plant could be going for cars and the robot can – it's run by computer, they're not perfect. You really have to watch for them, what they're doing, not spinning around spraying you or – so I was watching for the kind of shots I wanted to make.

Further, while Plaintiff was taking the photographs, the car body that is getting painted is, all the while, moving away from her [Hunter deposition, page 94, lines 7-13].

As Plaintiff was following the skid and car body into the paint booth:

7

(a)     the skid and car body in front of her was moving at a speed of five (5) meters per minute [Rathsack Deposition (Exhibit C), page 16, lines 20-22, and page 24, lines 3-21].

(b)     another skid and car body was coming up behind Plaintiff, also moving at a speed of five (5) meters per minute, requiring Plaintiff to keep moving so she would not get run over.

(c)     Plaintiff was following the skid and car body in front of her towards the robotic paint booth, all the while taking photographs of the moving robotic arms.

(d)     Plaintiff's attention was focused on the moving robotic arms because:

(1)     that is what she had been hired to photograph; and

(2)     Bruno Welsch had warned Plaintiff that the robots were dangerous, because they are moving, they are fast, and they are strong [Welsch Deposition (Exhibit B), page 8, lines 15-23].

(e)     during a substantial portion of this process the skid and the car body obstructed Plaintiff's view of the area where the grate was missing.

(f)     At some point during this process, the skid and the car body had to have moved a sufficient distance to expose the gap created by the missing grate; otherwise, Plaintiff would not have fallen into it.

10.     On the third or fourth time Plaintiff set her tripod down, she believes that she set it down straddling the hole into which she stepped. (Exhibit "A", pp. 80, Line 1 through 81 Line 20, *attached*).

**Plaintiff's Response:** Denied for two reasons:

(a)     At page 81, lines 9-17 of Plaintiff's deposition, Plaintiff testified:

Q.     Do you think you set up your tripod one, two, or three times before this accident?

8

A.    I don't know.  Maybe a couple, maybe three."

(b)    At page 82, lines 2-10, page 83, line 1 to page 84, line 3 of Plaintiff's deposition, Plaintiff

testified:

Q.    On the last one, do you get your tripod established and firmly set?

A.    No.  I am setting it down trying to get it locked into the sides and my foot slips.
And as my foot slips, my tripod locks down onto the sides, and that is what I used
to pull myself up so I wouldn't go through that hole.

Q.    Okay.  At the time that you set your tripod up in front of that hole, how far was the
tripod from the hole?

A.    I don't think we can say that I set it up.  I was in the process of setting it up."

* * *

Q.    But what I'm asking is this: As you were trying to set up the tripod in front of this
hole, about how far was your tripod from the hole?

A.    It straddled it probably.

Q.    Straddled the hole?

A.    Probably, yeah, because I didn't see it.

Q.    Okay.

A.    So I'm walking with all my gear and getting ready, okay, I want this shot, set my
tripod down, take a step, my tripod locks down or sets down on these
(indicating), my foot slips.  I look down, and there's death, seriously.

Q.    What did your foot slip on?

A.    It slipped into the hole.  I'm walking on this (indicating), and my foot slips into the
hole.

Q.    Okay.  While you're setting up your tripod?

9

A.    While I'm carrying my tripod, thinking that I'm going to set it down in a second, and I'm setting it down, and my foot goes into the hole

11.    Plaintiff seeks damages for personal injuries she claims to have suffered as a result of this fall, and she asserts general negligence claims against Durr.  (Plaintiff's Complaint, ¶¶ 6 through 12, attached).

**Plaintiff's Response:** Admitted

### Plaintiff's Statement of Undisputed Facts

Plaintiff submits the following as additional undisputed facts material to the issues raised by Defendant's Motion for Summary Judgment:

12.    Durr builds paint shops and assembly lines for car manufacturers [Christian Rathsack Deposition (Exhibit C), page 7, lines 7-9].

13.    Christian Rathsack is employed by Durr [Rathsack Deposition (Exhibit C), page 7, lines 5-6] and was employed by Durr on the date of the accident which is the subject of this lawsuit [Rathsack Deposition (Exhibit C), page 45, lines 16-18].

14.    About two (2) weeks before Plaintiff's accident, Mr. Rathsack removed the grate [Rathsack Deposition (Exhibit C), page 17, lines 11-12 and page 18, lines 19-23].  Mr. Rathsack did this because the grate in question was causing skids (which carried the car bodies through the robotic paint booth at a speed of 5 meters per minute) [Rathsack Deposition (Exhibit C), page 16, lines 20-22, and page 24, lines 3-21]), to bump into the grate [Rathsack Deposition (Exhibit C), page 16, lines 9-16], which, in turn, caused the robotic paint arms to collide with the car bodies [Rathsack Deposition (Exhibit C), page 45, lines 6-12].

10

15.    Plaintiff was to take photographs of car bodies being painted in the robotic paint booth at the Durr facility [[See Accident Report, authored by Christian Rathsack, attached hereto as Exhibit G; Rathsack Deposition (Exhibit C), page 37, line 13 to page 38, line 8] and Mr. Rathsack was to show her the robot lines [Rathsack Deposition (Exhibit C), page 11, line 21 to page 12, line 2].

16    Mr. Rathsack let Plaintiff into the area where the robotic painting was taking place [Rathsack Deposition (Exhibit C), page 14, lines 6-9].

17.    Mr. Rathsack, in the accident report that he filed with Durr, states:

" . . .  I stopped a body in BC-Air (previous station) and switched this station off when the painting process was finished.  Together with the photographer I then entered the BC-Air booth, and we positioned the tripod with camera at a suitable place.  I then walked over to the control point of the ESTA-BC booth and started the conveyor." [See Accident Report, authored by Christian Rathsack, attached hereto as Exhibit G].

18.    While Plaintiff was taking photographs, Mr. Rathsack was at the control desk operating the robots while Plaintiff was photographing the robotic painting process, all while following and photographing the car body, on the skid, as it traveled at a constant speed of 5 meters per minute through the robotic paint booth [Rathsack Deposition (Exhibit C), page 22, lines 9-16; page 16, lines 20-22; and page 24, lines 3-21].

19.    While a vehicle body was moving through the paint booth at 5 meters per minute and was being painted by the robotic paint arms [Rathsack Deposition (Exhibit C), page 23, line 19, to page 24, line 21], Mr. Rathsack, who was in the control room, states: "I was standing outside, and my view changed from robot to Anne Marie, from robot to Anne Marie, then robot, no Anne Marie" [Rathsack Deposition (Exhibit C), page 23, lines 9-17].

20.    At the time of the accident, the car body was directly in front of Mr. Rathsack, Plaintiff was to Mr. Rathsack's right, and the car body was moving away from Plaintiff [Rathsack Deposition (Exhibit C), page 25, lines 6-23].  As Mr. Rathsack testified in his deposition at page 38, line 20 to page 39, line 11:

> Q.    So that I understand how this was laid out, the area where the grate had been removed and the body that was being painted, had that body been over the hole created by the removal of the grate before this accident happened?
>
> A.    For sure the body passed the hole.
>
> Q.    Okay.  So the body was going away from the hole when this accident happened.
>
> A.    Yes.

21.    When Plaintiff disappeared from view, Mr. Rathsack "thought something was wrong" [Rathsack Deposition (Exhibit C), page 26, lines 18-19] and pressed an emergency button to stop the skid that was carrying the car body that was being painted [Rathsack Deposition (Exhibit C), page 26, lines 10-16].

22.    Mr. Rathsack then entered the paint booth and saw Plaintiff hanging in the hole where Mr. Rathsack had removed the grate two weeks earlier [Rathsack Deposition (Exhibit C), page 27, line 3 to page 28, line 4].  Mr. Rathsack believes that Plaintiff was hanging with one arm on her tripod [Rathsack Deposition (Exhibit C), page 29, lines 11-14].

23.    Even though the grate was missing [Rathsack Deposition (Exhibit C), page 15, lines 13-14], Mr. Rathsack had failed to point out to Plaintiff that any grates were missing [Rathsack Deposition (Exhibit C), page 15, lines 10-12] and had failed to point out to Plaintiff that a grate had been removed [Rathsack Deposition (Exhibit C), page 26, line 23 to page 27, line 2].  In fact, even after Mr. Rathsack

12

could no longer see Plaintiff and "thought something was wrong" [Rathsack Deposition (Exhibit C), page 26, lines 18-19], he did not recall that the grate had been removed [Rathsack Deposition (Exhibit C), page 26, lines 10-22]. Had Mr. Rathsack remembered that there was a grate missing, he would have told Plaintiff [Rathsack Deposition (Exhibit C), page 36, lines 19-22].

24.     In his accident report, Mr. Rathsack states:

"When talking to the photographer, she told me that she had followed the body with the tripod and with her eye on the camera, and for this reason had not seen the missing grid. I cannot, at the moment, explain why I hadn't thought of the 'hole' before. Maybe the car body had covered up the hole while we had been positioning the camera." [Accident Report, authored by Christian Rathsack, attached hereto as "Exhibit G"].

25.     When Mr. Rathsack removed the grate, he did not place any warning or notice that the grate had been removed [Rathsack Deposition (Exhibit C), page 34, lines 5-8].

26.     Even though it is part of the Durr culture "to be very safe" [Rathsack Deposition (Exhibit C), page 35, lines 13-15], even though it is common to see areas where something is wrong at a Durr plant "marked with brightly colored cones or signs or tape" [Rathsack Deposition (Exhibit C), page 35, lines 4-9], even though Christian Rathsack had access to any cones, or signs or brightly colored tape that he wanted [Rathsack Deposition (Exhibit C), page 35, lines 16-19], even though Christian Rathsack had, in fact, used such items before [Rathsack Deposition (Exhibit C), page 35, lines 20-22], when Mr. Rathsack removed the grate, he did not place any warning or notice that the grate had been removed [Rathsack Deposition (Exhibit C), page 34, lines 5-8].

27.     At page 49, line 4 to page 50, line 9 of his deposition, Christian Rathsack testified as follows:

Q.     So then she sets up a tripod in the area where a little bit later she has her accident?

13

A.      Yes.

Q.      And you see her set up the tripod?

A.      Yes.

Q.      Was there a vehicle there, a car body?

A.      Yes.

Q.      Was it covering the hole?

A.      I don't remember for sure.

Q.      Did you notice the hole?

A.      No.

Q.      If you had noticed the hole, would you have pointed it out to her?

A.      Yes.

Q.      So she sets up the tripod, and then you leave her alone in the paint room?

A.      Yes.

Q.      You start the car moving?

A.      Yes.

Q.      And did you see her then move the tripod to a second position?

A.      No.

Q.      Okay.  So the next you knew, there was no more Anne Marie?

A.      Yes.

28.    Scott Matthew Wagner is the Corporate Safety Officer for Durr and has been employed by Durr for approximately five and a half years [Wagner Deposition (Exhibit A), page 3, lines 11-21].

29.    The focus of Mr. Wagner's job is safety in the workplace [Wagner Deposition (Exhibit A), page 28, lines 12-14].

30.    Safety in the workplace is something that is a high priority at Durr [Wagner Deposition (Exhibit A), page 28, lines 15-17].

31.    Durr gives Mr. Wagner the freedom and the latitude to see to it that safety remains a high priority at Durr [Wagner Deposition (Exhibit A), page 28, lines 18-21].

32.    Scott concedes that having somebody enter a paint booth where part of the flooring had been removed creates a potential form injury [Wagner Deposition (Exhibit A), page 16, line 22 to page 17, line 1].

33.    Somebody in the paint booth who has good vision and good consciousness of safety may not be able to see the missing flooring because it was obscured by a moving auto body [Wagner Deposition (Exhibit A), page 17, lines 2-16].

34.    The hazard created by the missing grid is that somebody may fall into the cavity created by the gap [Wagner Deposition (Exhibit A), page 17, lines 17-20].

35.    According to Mr. Wagner, the techniques available to advise a person of the missing grid would have included signage, verbal communication, barricades, and warning tape [Wagner Deposition (Exhibit A), page 20, line 18 to page 21, line 11], though the best thing to do, from a safety point of view, is to eliminate the hazard altogether [Wagner Deposition (Exhibit A), page 22, lines 7-11].

36.     While in the robotic paint booth, one must pay attention to the moving robotic arms so you don't get knocked in the head [Wagner Deposition (Exhibit A), page 24, lines 4-10].

37.     Bruno Welsch is a general director for Durr and has worked for Durr for the past ten (10) years [Welsch Deposition (Exhibit B), page 4, lines 16-20].

38.     Mr. Welsch was advised that Plaintiff would be coming to the Durr facility in Montgomery to take photographs one week before Plaintiff's arrival [Welsch Deposition (Exhibit B), page 5, lines 17-24].

39.     Mr. Welsch gave Plaintiff a tour through the various portions of the Durr plant, and this tour took at least one (1) hour [Welsch Deposition (Exhibit B), page 6, line 17 to page 7, line 1].

40.     Part of this tour included the area where the accident later happened [Welsch Deposition (Exhibit B), page 7, lines 5-8].

41.     Even though Mr. Welsch was in the paint booth itself [Welsch Deposition (Exhibit B), page 8, lines 2-6] he did not notice that a grid was missing [Welsch Deposition (Exhibit B), page 7, lines 9-10].

42.     Mr. Welsch warned Plaintiff that the robots were dangerous, because they are moving, they are fast, and they are strong [Welsch Deposition (Exhibit B), page 8, lines 15-23].

43.     Other than warning her to watch out for the robotic arms, Mr. Welsch did not give Plaintiff any other cautions or warnings [Welsch Deposition (Exhibit B), page 9, lines 4-6].

44.     When Plaintiff was taking her photos, construction of the plant was already completed, all the hazards of construction were in the past [Welsch Deposition (Exhibit B), page 21, line 23 to page 22, line 7], and the plant was reasonably safe [Welsch Deposition (Exhibit B), page 22, lines 8-9]. However,

16

according to Mr. Welsch, one still had to watch out for things that had to move to facilitate the production process, however, such as robotic arms [Welsch Deposition (Exhibit B), page 22, lines 10-16].

45.    The grids were installed by Durr [Welsch Deposition (Exhibit B), page 30, lines 21-23, page 31, lines 15-16].

46.    When Plaintiff entered the robotic paint booth to take the photographs, she was carrying with her (1) a camera with a telephoto lens on it, (2) a camera bag containing other lenses, another body, batteries, filters, and other equipment that Plaintiff uses, (3) a flash, (4) an extra battery pack, (5) a film bag, and (6) a tripod [Hunter Deposition (Exhibit D), page 53, lines 2 to page 54, line 9], all of which weighed approximately 35 pounds [Hunter Deposition (Exhibit D), page 54, lines 10-14], with the tripod weighing approximately seven pounds [Hunter Deposition (Exhibit D), page 54, lines 15-22].

47.    Plaintiff testified in her deposition at page 57, lines 10-22:

Q.    All right.  You go in, and what do you do?

A.    I have my camera bag, my film bag, and my camera on my tripod, and I'm watching the car bodies.  There's one in front of me, one ahead of me, and then there's car bodies that come up behind me.  And I start – I start watching to see if the robots are ready to start painting, I watch the sensors and I start walking with my tripod . . ."

48.    Plaintiff testified in her deposition at page 58, lines 10-21:

Q.    All right.  Before you actually start taking pictures, does anything move?

A.    As soon as – yeah.  As soon as – I'm waiting for the bodies to start moving, and I don't start taking pictures until the bodies start moving.  Then a body moves forward, then I start to move forward, and I follow its line, get as close as I can without putting myself in danger of getting sprayed with paint so –

49.    Plaintiff testified in her deposition at page 65, line 20 to page 66, line 10:

17

A.    When I first came in, I stopped right there, and I turned around and got these feathers and some shots going back down the line from behind me.  And then I waited for the body in front of me to start moving and then there was another body in front for when the robot started to paint, and then I started to walk forward.

Q.    Okay.  And is that when your accident happened?

A.    Yes.

50.    When Plaintiff first entered the robotic paint booth, Christian Rathsack showed her where the emu feathers are and advised Plaintiff that this was something new - something that no one else had done before. [Hunter Deposition (Exhibit D), page 74, lines 9-15].  Plaintiff then took photographs of the emu feathers [Hunter Deposition (Exhibit D), page 74, lines 16-20].

51.    Plaintiff had been hit by a car before and had been hit by a robot before [Hunter Deposition (Exhibit D), page 72, lines 11-12].

52.    Once the cars started moving, one was moving away from Plaintiff and one was moving towards her [Hunter Deposition (Exhibit D), page 72, line 13 to page 73, line 23], and Plaintiff had to move away to avoid the car body coming towards her [Hunter Deposition (Exhibit D), page 73, lines 2-15].

53.    Attached hereto and designated "Exhibit E" is an excerpt from the Site Safety Manual pertaining to the Durr facility in Montgomery, Alabama where Plaintiff's accident occurred.  In pertinent part, this Site Safety Manual states as follows:

6.6.1    No floor grating is to be removed from any booth or other grated location without first contacting the Safety Department, then obtaining and completing a **Grating Removal Permit**.  *Permits must be done on a daily basis*.  Prior to grating removal and the start of the workday, the Safety Department will review the procedures and protective measures checked on the permit and sign off.  Only then, will a subcontractor or individual be allowed to remove grating.

6.6.2        For grating removal, **All** of the following requirements shall apply:

6.6.2.1      Never remove or leave a piece of grating out without first installing a rigid barricade, guardrail or equivalent, which will entirely encompass the opening, or properly cover the opening.

6.6.6        Additional measures:

- When working in the area of removed grating, always ensure there is enough light so the opening can be easily seen.
- Warn and inform other personnel in the area of the removed grating.

\* \* \*

- All grating must be reinstalled at the completion of the work task or at the end of the shift. No opening shall remain beyond the end of the shift, unless a new permit is obtained.
- **No opening shall ever be left unguarded . . . post a watch if necessary.**

**Note:**        Any requirement for deviation or change to the above procedure shall be submitted in writing to the safety department for review and approval prior to any action taken.

54.        The Floor Grating Removal Permit that should have been - but was not - obtained in this case is attached hereto and is a part of "Exhibit E".

55.        The Supervisor's Incident Investigation Report completed by Durr is attached hereto and designated "Exhibit F". In pertinent part, it states:

"Unsafe Practices: Working or allowed to work in area with missing grating"

"Unsafe Conditions: Exposure to a fall hazard and/or trip hazard to other elevation"

"Contributing Factors: Failure to inspect area or have area inspected to assure free of floor openings"

"Loss Severity Potential: Major"

56.     In ¶ 7 of Plaintiff's Affidavit, attached hereto as Exhibit H, Plaintiff states:

"The grids that formed the 'floor' of the paint booth formed, as far as I could see, a smooth, continuous, and uninterrupted plane.  Not a single grid was missing (except for the one that was concealed from view by the car body).  In fact, I have carefully reviewed each and every photograph that I took while in the robotic paint booth, and it is impossible to determine with any certainty that any photograph shows that a grate was missing."

## **Argument**

In **Culpepper v. Weihrauch**, 991 F. Supp. 1397 (M.D.Ala. 1997), this Court ruled, at 1401-

1402:

"In order to find contributory negligence as a matter of law, there must be a finding that the plaintiff put herself in danger's way, a finding that the plaintiff appreciated the danger confronted, and that such appreciation of the danger was conscious at the moment the incident occurred.  **Hicks v. Commercial Union Ins. Co.**, 652 So.2d 211, 219 (Ala. 1994).  A court may decide the issue of contributory negligence as a matter of law 'only when the facts are such that all reasonable [people] must draw the same conclusion therefrom.'  **Caterpillar Tractor Co. v. Ford**, 406 So.2d 854, 857 (Ala. 1981)."

Similarly, in **Salter v. U.S.**, 880 F. Supp. 1524 (M.D.Ala. 1995), this Court ruled at 1533:

"It is well established under Alabama law that 'a plaintiff cannot recover in a negligence suit when the plaintiff's own negligence is shown to have proximately contributed to the damage, notwithstanding a showing of negligence on the part of the defendant.'  **Knight v. Alabama Power Co.**, 580 So.2d 576, 577 (Ala. 1991), quoting, **Brown v. Piggly-Wiggly Stores**, 454 So.2d 1370 (Ala. 1984).  Contributory negligence requires a finding that the plaintiff had knowledge of the danger and appreciated the danger under the circumstances and yet put himself in the way of harm.  **Wilson v. Alabama Power Co.**, 495 So.2d 48, 49 (Ala. 1986).  Where a plaintiff 'had knowledge of facts sufficient to warn a man of ordinary sense and prudence of the danger to be encountered, and of the natural and probable consequences of his own conduct[],' plaintiff is 'guilty of negligence if he fails to exercise ordinary care to discover and avoid the danger and the injury.'  **Alabama Power Co. v. Mosley**, 294 Ala. 394, 318 So.2d 260, 263 (1975).  Defendant argues that Salter knew or should have known of the dangers associated with pesticides and that Salter placed himself in the way of harm by returning to work for the Foundation year after year.  Defendant points out that Salter knew that the fields were being sprayed with pesticides and that he was having physical contact with the pesticides. (Salter Dep. at 81-

20

83 & 115-118). Defendant also points to evidence in the record from which a reasonable factfinder could conclude that Salter recognized that the pesticides were the cause of his physical ailments. (Salter Dep. at 210-214 & 184-189). However, Salter argues that he lacked the requisite knowledge or appreciation of the danger that he actually faced because he was repeatedly told that he was in no danger. (Salter Dep. 129-132, 196-199, 213-214, 249; Salter Aff.) The court finds that the issue of contributory negligence is inappropriate for summary judgment in this case. **'Unless the evidence bearing upon [contributory negligence] is entirely free of doubt and adverse inference, this question must be submitted to [a trier of fact].'** **Lewis v. Sears, Roebuck & Co.**, 512 So.2d 712, 713 (Ala. 1987). **When different inferences and conclusions can reasonably be drawn from the evidence, contributory negligence cannot be determined as a matter of law.** See, e.g., **Savage Indus., Inc. v. Duke**, 598 So.2d 856, 859 (Ala. 1992); **American Furniture Galleries, Inc. v. McWane, Inc.**, 477 So.2d 369, 372 (Ala. 1985). The evidence before this court creates a genuine issue of material fact on the issue of contributory negligence. Therefore, Defendant's Motion for Summary Judgment is due to be DENIED to the extent that it is based on Salter's alleged contributory negligence."   [emphasis added]

"The question . . . whether the plaintiff is guilty of contributory negligence as a matter of law [is] one for the court to decide . . . only when the facts are such that all reasonable men must draw the same conclusion therefrom, and the question is for the jury when, under the facts and circumstances, reasonable minds may fairly differ upon the question of negligence. . . ." **Meadowcraft Industries v. Price**, 817 So.2d 697, 701 (Ala.Civ.App. 2000), quoting **Robertson v. Travelers Inn**, 613 So.2d 376, 379 (Ala. 1993).

In this case, the evidence of Durr's negligence and carelessness (and the evidence that Plaintiff was not at all negligent or careless) is overwhelming.  For instance:

1.    Durr **created** the dangerous condition by removing the grate [Rathsack Deposition (Exhibit C), page 17, lines 11-12 and page 18, lines 19-23].

2.    Durr did not follow its own safety policies to warn of or barricade the dangerous condition. **See** Site Safety Manual, attached hereto as "Exhibit E".

21

3.    In fact, Durr actually concealed the dangerous condition by placing a skid and car body atop the opening created by the removed grate [Affidavit of Anne Marie Hunter, ¶4, attached hereto as "Exhibit H"].

4.    Durr exposed Plaintiff to this dangerous condition - without any warning to her that the dangerous condition existed - by escorting her into the paint booth, turning on the robotic arms for her to photograph, and placing her in the path of moving skids and car bodies.

5.    While Bruno Welsch warned Plaintiff to be cautious of the robotic arms in the paint booth, as they moved very quickly and were very strong, Plaintiff was not warned that a grate was missing [Affidavit of Anne Marie Hunter, ¶2, attached hereto as Exhibit H].

6.    When Christian Rathsack took Plaintiff into the Paint Booth, a car body sat atop and concealed from view the area where the grate was missing [Affidavit of Anne Marie Hunter, ¶3, attached hereto as Exhibit H].

7.    The car body was about fifteen (15) feet long and each grate was about three and a half to four (3 ½ to 4) feet long [Affidavit of Anne Marie Hunter, ¶4, attached hereto as Exhibit H].

8.    When Plaintiff was taking photos of the emu feathers, she was facing away from the car body that concealed from view the area where the grate was missing [Affidavit of Anne Marie Hunter, ¶5, attached hereto as Exhibit H].

9.    Once Mr. Rathsack activated the robotic paint booth, things happened very quickly and simultaneously [Affidavit of Anne Marie Hunter, ¶6, attached hereto as Exhibit H]. For instance:

a.   The car body that was concealing the area where the grate was missing began to move forward (toward the moving robotic arms that Mr. Welsch had warned Plaintiff to beware of) [Affidavit of Anne Marie Hunter, ¶6.a, attached hereto as Exhibit H].

b.   Another car body began coming towards Plaintiff from behind, so Plaintiff had to move forward so as not to be run over  [Affidavit of Anne Marie Hunter, ¶6.b, attached hereto as Exhibit H].

c.   The robotic arms in front of Plaitniff began swinging about and spraying paint [Affidavit of Anne Marie Hunter, ¶6.c, attached hereto as Exhibit H].

d.   Plaintiff had to take photographs while following the car body in front of her toward the moving robotic arms  [Affidavit of Anne Marie Hunter, ¶6.d, attached hereto as Exhibit H].

e.   Very little time elapsed between Mr. Rathsack starting the robotic arms and Plaintiff's fall - only a matter of seconds  [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H].  During almost the entirety of that time, the car body concealed the fact that there was a grate missing [Affidavit of Anne Marie Hunter, ¶6.e, attached hereto as Exhibit H].

f.   Even after the car bodies started moving forward, the car body in front of Plaintiff continued to conceal the fact that there was a grate missing, because the length of the car body was much longer than the length of the missing grate [Affidavit of Anne Marie Hunter, ¶6.f, attached hereto as Exhibit H].

g.      While taking photographs in the robotic paint booth, Plaintiff followed the car body in front of her and tried to stay as close to it as possible - close enough to reach out and touch it with her hand  [Affidavit of Anne Marie Hunter, ¶6.g, attached hereto as Exhibit H].  However, the distance Plaintiff was from the moving car body would vary by a few feet since it was constantly moving and Plaintiff would stop for a second or two (just long enough to set down her tripod and snap a few photographs) before moving forward again, following the car body in front of her [Affidavit of Anne Marie Hunter, ¶6.g, attached hereto as Exhibit H].

7.      The grids that formed the "floor" of the paint booth formed, as far as I could see, a smooth, continuous, and uninterrupted plane.  Not a single grid was missing (except for the one that was concealed from view by the car body) [Affidavit of Anne Marie Hunter, ¶7, attached hereto as Exhibit H].  In fact, Plaintiff has carefully reviewed each and every photograph that she took while in the robotic paint booth, and it is impossible to determine with any certainty that any photograph shows that a grate was missing  [Affidavit of Anne Marie Hunter, ¶7, attached hereto as Exhibit H].   If a careful review today (*knowing what we know now, that is, that a grate was missing and that an accident occurred*) of each photograph taken by Plaintiff in robotic paint booth cannot reveal, with certainty, that a grate was missing, then the finder of fact would have to conclude that the grate was concealed by a car body during the time that Plaintiff was in the paint booth and/or that the hole created by the missing grate was not something that could be seen in the exercise of ordinary care.

24

8.    When Mr. Rathsack started up the paint booth, the car body in front of Plaintiff that she was photographing, moved forward in a steady and smooth fashion, giving no indication that something beneath it was missing or malfunctioning [Affidavit of Anne Marie Hunter, ¶8, attached hereto as Exhibit H].

9.    The grid system that formed the "floor" of the paint booth was of a uniform neutral color and each grid consisted mostly of empty space (i.e., you could see through it).  And, what you saw when you looked through the grids was a background of that same neutral color.  In other words, it was not at all the same as there being a hole in a solid floor.  Further, there was no contrast between the color of the grids and the color of what was seen when one looked through the grids [Affidavit of Anne Marie Hunter, ¶9, attached hereto as Exhibit H].

10.    The day following the accident, Mr. Rathsack stated to Plaintiff that he was the cause of Plaintiff's having been injured [Affidavit of Anne Marie Hunter, ¶10, attached hereto as Exhibit H].

Because "reasonable minds may fairly differ upon the question of negligence" "under the facts and circumstances" of this case, "the question is for the jury". . . ."  **Meadowcraft Industries v. Price**, 817 So.2d 697, 701 (Ala.Civ.App. 2000), quoting **Robertson v. Travelers Inn**, 613 So.2d 376, 379 (Ala. 1993).  Because this is not a case where "the evidence bearing upon [contributory negligence] is entirely free of doubt and adverse inference, this question must be submitted to [a trier of fact]."  **Salter v. U.S.**, 880 F. Supp. 1524 (M.D.Ala. 1995), at 1533, quoting from **Lewis v. Sears, Roebuck & Co.**, 512 So.2d 712, 713 (Ala. 1987).  As this Court ruled in **Salter v. U.S.**, id., "[w]hen different inferences and

25

conclusions can reasonably be drawn from the evidence, contributory negligence cannot be determined as a matter of law", citing **Savage Indus., Inc. v. Duke**, 598 So.2d 856, 859 (Ala. 1992) and **American Furniture Galleries, Inc. v. McWane, Inc.**, 477 So.2d 369, 372 (Ala. 1985).  Accordingly, summary judgment cannot be entered in this case.

### Conclusion

For the reasons set forth above, Plaintiff prays the Order of the Court denying Defendant's Motion for Summary Judgment.

HANKINS & CONKLIN, P.C.

 /s/   Thomas E. Hankins
Thomas E. Hankins - MO #26005
6812 North Oak Trafficway, Suite 5
Gladstone, Missouri 64118-2587
Telephone: (816) 436-3100
Fax No. (816) 436-8643
E-Mail: tomhankinslaw@cs.com

**Attorney for Plaintiff**

<u>**Certificate of Service**</u>

I hereby certify that on March 6, 2007, I electronically filed the foregoing document with the Clerk of the United States District Court for the Middle District of Alabama using the CM/ECF system, which sent notification of such filing to the following:

Mr. James B. Carlson
Sirote & Permutt, P.C.
2311 Highland Avenue South
P.O. Box 55727
Birmingham, Alabama    35255-5727
Jcarlson@Sirote.com

       /s/   Thomas E. Hankins
       Thomas E. Hankins
       Attorney for Plaintiff