Hunter v. Durr
06 - CV - 00411

—

# Exhibit A

to Plaintiff's Suggestions in Opposition
to Defendant's Motion for Summary Judgment

—

Excerpts from Deposition of Scott Matthew Wagner
taken November 10, 2006

1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
AT MONTGOMERY

Anne Marie Hunter,

        Plaintiff,

vs.                         2:06-CV-00411-WHA-SRW

Durr Systems, Inc.,

        Defendant.

**ORIGINAL**

_____/

    The Deposition of SCOTT MATTHEW WAGNER taken by the Plaintiff, pursuant to Notice, before Carol L. Martin (CSR-3532), a Notary Public within and for the County of Oakland, (acting in Wayne County), State of Michigan, at the Embassy Suites, 19525 Victor Parkway, Livonia, Michigan, on November 10, 2006.

APPEARANCES:

    HANKINS & CONKLIN, P.C.
    BY:  THOMAS E. HANKINS
    6812 North Oak Trafficway, Suite 5
    Gladstone, Missouri 64118-2587
    (816) 436-3100

        Appearing on behalf of the Plaintiff.

    SIROTE & PERMUTT
    BY:  MR. CHRISTOPHER A. BOTTCHER
    2311 Highland Avenue South
    Birmingham, Alabama 35205
    (205) 930-5100

        Appearing on behalf of the Defendant.

```
 1                              Livonia, Michigan
 2                              Friday, November 10, 2006
 3                              At or about 9:44 a.m.
 4                                  -   -   -
 5              S C O T T   M A T T H E W   W A G N E R
 6      was thereupon called as a witness herein, and after
 7      having been first duly sworn to tell the truth, was
 8      examined and testified as follows:
 9                              EXAMINATION
10      BY MR. HANKINS:
11      Q    State your name, please.
12      A    Scott Matthew Wagner.
13      Q    And whereabouts do you live?
14      A    I live in Northville, Michigan.
15      Q    Who do you work for?
16      A    Durr Systems.
17      Q    How long have you been with Durr?
18      A    Approximately five and a half years.
19      Q    What do you do for them?
20      A    I am currently the Corporate Safety Officer.  The head
21           of safety responsibilities for the company.
22      Q    Were you down in Montgomery, Alabama when my client
23           got hurt?
24      A    No.
25      Q    Where were you in that time period?
```

De Scribe Reporting, Inc.
1-(877)-733-DEPO

1   A   Yes, I agree.
2   Q   Now, sometimes a person must go into a hazardous area
3       to do his or her job. Would you agree with me there?
4   A   Yes, I agree.
5   Q   When a person must go into a hazardous area to do his
6       or her job, one of the ways to assure safety is to
7       point out the hazards that exist to that person,
8       correct?
9   A   Correct.
10  Q   In Anne Marie Hunter's incident, can you see any
11      reason not to have advised her that a grid was
12      missing?
13  A   Other than the fact that she should have been aware
14      that she was in a working plant environment.
15  Q   Well, to put it more simply, I mean if Christian had
16      called you up and said, "A photographer is about to
17      enter the paint booth and there's a grid missing,
18      should I tell her about it" --
19  A   I would say yes.
20  Q   Yeah. There is no downside to telling her, is there?
21  A   No.
22  Q   And I take it that you would agree with me that having
23      somebody enter a paint booth where part of the
24      flooring had been removed creates a potential for
25      injury?

| | | |
|---|---|---|
| 1 | A | Yes, I agree. |
| 2 | Q | And you understand that the part of the flooring that |
| 3 | | was removed would be obscured from time to time by car |
| 4 | | bodies moving over it? |
| 5 | | MR. BOTTCHER: Object to the form. |
| 6 | | THE WITNESS: Yes. |
| 7 | | BY MR. HANKINS: |
| 8 | Q | The reason why that may be important from a safety |
| 9 | | point of view is that somebody in the paint booth who |
| 10 | | has good vision and good consciousness of safety may |
| 11 | | not be able to see the missing flooring because it was |
| 12 | | obscured by a moving -- paint moving auto body? |
| 13 | | MR. BOTTCHER: Object to the form. |
| 14 | | BY MR. HANKINS: |
| 15 | Q | Correct? |
| 16 | A | Correct. |
| 17 | Q | The hazard created by the missing grid is that |
| 18 | | somebody may fall into the cavity created by the gap, |
| 19 | | correct? |
| 20 | A | Correct. |
| 21 | Q | Have you talked with Christian or communicated with |
| 22 | | Christian to learn why he did not tell Anne Marie of |
| 23 | | the missing grid? |
| 24 | A | I have not. |
| 25 | Q | Have you through your independent investigation |

|    |   |   |
|----|---|---|
| 1  |   | as far as our process goes. |
| 2  | Q | But as your job as Corporate Safety Officer, when an |
| 3  |   | accident happens, you do like to learn why it |
| 4  |   | happened, correct? |
| 5  | A | Yes. |
| 6  |   | MR. BOTTCHER: Object to the form. |
| 7  |   | BY MR. HANKINS: |
| 8  | Q | And one of the reasons why you like to learn why it |
| 9  |   | happened is to see if maybe you can learn from it and |
| 10 |   | prevent similar accidents in the future? |
| 11 |   | MR. BOTTCHER: Object to the form. |
| 12 |   | THE WITNESS: Yes. |
| 13 |   | BY MR. HANKINS: |
| 14 | Q | So at what point did you gain an understanding as to |
| 15 |   | why the grid had been removed? |
| 16 | A | I don't believe I have an understanding as to why the |
| 17 |   | grid was removed. |
| 18 | Q | Are there any techniques available in your field of |
| 19 |   | expertise that could have advised a person of the |
| 20 |   | missing grid in this particular paint booth? |
| 21 |   | MR. BOTTCHER: Don't guess. If you have |
| 22 |   | a judgment, that's one thing, but you can't guess or |
| 23 |   | speculate. |
| 24 |   | THE WITNESS: A judgment would be there's |
| 25 |   | various ways of warning somebody of a missing grid. |

```
 1              BY MR. HANKINS:
 2      Q       Tell me what those are.
 3      A       Signs is one example.
 4      Q       Others?
 5      A       Word-of-mouth, information, meetings can be discussed
 6              what's going on in the general vicinity, having
 7              someone barricade the area, if applicable.
 8      Q       Do you ever use tape?
 9      A       Warning tape?
10      Q       Yes.
11      A       Yes.
12      Q       Is warning tape only used as a barricade item or is it
13              also used as a warning item?
14      A       Warning tape isn't used as a barricade, it's usually
15              used as a visual warning.
16      Q       Because people can duck under it or step over it or go
17              through it?
18      A       Correct.
19      Q       Any other devices available to you in the safety
20              industry that you can use to notify people of a
21              missing grid, such as we're involved with here?
22      A       I would say, yes, there's many things that can be
23              used.
24      Q       Are most of them visual cues?
25      A       As far as a warning, yes, it would be visual.
```

| | | |
|---|---|---|
| 1 | Q | Getting back to the orange cones, that's a visual cue? |
| 2 | A | Correct. |
| 3 | Q | Warning tape is a visual cue? |
| 4 | A | Correct. |
| 5 | Q | A sign is a visual cue? |
| 6 | A | Correct. |
| 7 | Q | From what other -- aside from a visual cue and then a |
| 8 | | verbal, "Watch out," what else is there in your |
| 9 | | repertoire of safety devices? |
| 10 | A | Well, the best thing to do is to eliminate the hazard |
| 11 | | altogether or engineer it out. |
| 12 | Q | Was this ultimately done here, that it was eliminated? |
| 13 | | In other words, as we're sitting here today, was that |
| 14 | | grid replaced? |
| 15 | A | I don't know. |
| 16 | Q | In your field in corporate safety, is it also |
| 17 | | important to set limits as to where different people |
| 18 | | are allowed access in a plant? |
| 19 | | MR. BOTTCHER: I'm going to just object |
| 20 | | to sort of the breath of that question. |
| 21 | | BY MR. HANKINS: |
| 22 | Q | And by way of example, I mean if I went to the |
| 23 | | facility in Montgomery, Alabama, my guess is perhaps I |
| 24 | | could enter into the corporate office area where there |
| 25 | | are desks and chairs and a vending machine maybe, but |

| | | |
|---|---|---|
| 1 | Q | Are you familiar with the robotic paint booths, such |
| 2 | | as the one that is involved in this accident? |
| 3 | A | Yes, I'm familiar with them. |
| 4 | Q | And Bruno I believe mentioned that there were robotic |
| 5 | | arms that move at fairly high speed in those robotic |
| 6 | | paint booths. Would you agree with that |
| 7 | | characterization? |
| 8 | A | I would agree that there's movement. I don't |
| 9 | | necessarily believe that they're at high speed, but it |
| 10 | | is a hazard. |
| 11 | Q | And the hazard would be, to put it quite simply, that |
| 12 | | if you got too close and weren't paying attention, you |
| 13 | | could get knocked on the head with one of those moving |
| 14 | | arms? |
| 15 | A | Yes. |
| 16 | Q | And in a robotic paint booth such as the one where |
| 17 | | Anne Marie was when she had her accident, the robotic |
| 18 | | arms -- are they for a normal size person at waist |
| 19 | | level, at head level, ten feet above the surface? |
| 20 | | Where would the robotic arms be? |
| 21 | A | I can't answer that question. I don't know the |
| 22 | | specifics of the engineering robots in the booth. |
| 23 | Q | What is your understanding as to what Anne Marie |
| 24 | | Hunter was doing in the robotic paint booth? |
| 25 | A | My understanding is that she was taking pictures for |

```
 1    Q    Do you know where he went to?
 2    A    No, I don't.
 3    Q    Do you know somebody at Durr who would know the answer
 4         to that question?
 5    A    No.
 6    Q    Who was he closest to at Durr, to your knowledge?
 7    A    I don't know.
 8    Q    Did he have a secretary?
 9    A    I don't know.
10    Q    Did he have an assistant?
11    A    I don't know.
12    Q    Your job is focused on safety in the workplace, of
13         course, correct?
14    A    Yes.
15    Q    Is safety in the workplace something that is a high
16         priority at Durr?
17    A    Yes.
18    Q    Do you feel that Durr gives you the freedom and the
19         latitude to see to it that safety remains a high
20         priority at Durr?
21    A    Yes.
22              MR. HANKINS:  That's all I have.
23              (Deposition concluded at 10:21 a.m.)
24                       -      -      -
25
```